**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                        |   |                     |
|------------------------|---|---------------------|
|                        | : |                     |
| JAMES L. MILLER        | : |                     |
|                        | : |                     |
| v.                     | : | Civil No. CCB-04-1129 |
|                        | : |                     |
| U.S. FOODSERVICE, INC. ET AL. | : |              |
|                        | : |                     |
|                        | : |                     |

**MEMORANDUM**

In this case, two motions are pending: (1) U.S. Foodservice, Inc.'s ("USF") motion to dismiss Count VII of Miller's amended complaint, which alleges wrongful discharge; and (2) Miller's motion for partial summary judgment, in which he asserts that USF is responsible for payment of his legal fees pursuant to his Employment Agreement with USF.  Oral argument was heard on Nov. 21, 2005.  For the reasons that follow, I will deny USF's motion to dismiss and grant Miller's motion for partial summary judgment.[1]

I.      Motion to Dismiss Wrongful Discharge Claim

    A.      Background

James L. Miller was employed as Chief Executive Officer ("CEO") of USF until his resignation on May 13, 2003.  On the same date, he resigned from the Executive Board (also known as the Managing Board or "RVB") of Royal Ahold, USF's parent.  USF allegedly continued to pay Miller as a consultant until USF terminated his employment on or about September 29, 2003.  Miller alleges that USF wrongfully terminated him in the wake of its

---

[1] For additional background information, *see Miller v. U.S. Foodservice, Inc.,* 361 F.Supp.2d. 470 (D.Md. 2005).

discovery of various accounting irregularities at USF and other Royal Ahold subsidiaries.

According to Miller, the accounting irregularities at USF resulted in overstatements of income by USF and contributed to the restatement of Royal Ahold's financial position and earnings for fiscal year 2001 and the first three quarters of 2002.  Miller alleges that he had no knowledge of, and no involvement in causing, these accounting irregularities.

On February 24, 2003, Royal Ahold announced the overstatement of income at USF.  An investigation by the U.S. Securities and Exchange Commission ("SEC") ensued.  The SEC then requested an interview with Miller "to determine whether officials of Royal Ahold and USF may have committed violations of the U.S. securities laws and regulations."  Am. Compl. ¶ 35.  Miller, through counsel, told USF and Royal Ahold that he "was preparing a written proffer to the SEC setting forth his knowledge of the ... accounting irregularities" and that he planned to "fully cooperate with the U.S. authorities."  Am. Compl. ¶ 36.

On March 13, 2003, Miller was interviewed by AUSA Jonas, FBI agents, and representatives from the SEC.  During the interview, Miller allegedly "cooperated fully with the government and responded truthfully and completely to the government's questions...." Am. Compl. ¶ 38.  Shortly thereafter, Miller allegedly was informed by a member of the Royal Ahold Advisory Board that he "could no longer remain the CEO of USF and a member of the RVB" because the defendants were "upset that Miller cooperated with the government."  Am. Compl. ¶¶ 39, 70.

B.      Standard of Review

USF has moved to dismiss Miller's claim for wrongful discharge pursuant to Fed. R. Civ. P. 12(b)(6).  "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint;

importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Edwards*, 178 F.3d at 244. In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions. *See, e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (noting that the "presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions); *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995) (affirming Rule 12(b)(6) dismissal with prejudice because the plaintiff's alleged facts failed to support her conclusion that the defendant owed her a fiduciary duty at common law).

C.    Analysis

An at-will employee has an employment contract of infinite duration which is terminable for any reason by any party. *See Adler v. Am. Standard Corp.,* 432 A.2d 464 (Md. 1981). The tort of wrongful discharge is an exception to the well-established principle that an at-will employee may be discharged by his employer for any reason, or no reason at all. *Id.,* 432 A.2d at 467. "[T]o establish wrongful discharge, the employee must be discharged, the basis for the

employee discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee." *Wholey v. Sears Roebuck,* 803 A.2d 482, 489 (Md. 2002).  A cause of action for wrongful discharge is available not only to at-will employees, but to contractual employees as well.  *See Ewing v. Koppers Co.,* 537 A.2d 1173, 1175 (Md. 1988).

In order for a mandate of public policy to be sufficiently established to support a claim of wrongful discharge, "there must be a preexisting, unambiguous, and particularized pronouncement, by constitution, enactment or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the Maryland public policy on the topic not a matter of conjecture or even interpretation." *King v. Marriott Int'l, Inc.,* 866 A.2d 895, 903 (Md. Ct. Spec. App. 2005).  The purpose of this limitation is to "limit[] judicial forays into the wilderness of discerning 'public policy' without clear direction from a legislature or regulatory source." *Id., citing Milton v. IIT Research,* 138 F.3d 519, 523 (4th Cir. 1998).

The Maryland Court of Appeals has found that "terminating an employee on the grounds that the employee (as a victim or witness) gave testimony at an official proceeding or *reported a suspected crime* to the appropriate law enforcement or judicial officer is wrongful and contrary to public policy." *Wholey,* 803 A.2d at 495 (emphasis in original).  *Wholey* concerned a wrongful discharge claim by a Sears security guard who was fired after reporting the criminal activities of a store manager to his superiors.  In *Wholey,* the Maryland Court of Appeals found a statutory basis for protecting an employee from discharge in the circumstances described above. The current version of the statutes discussed in *Wholey* are found in Md. Code Ann., Crim. Law

§§ 9-303(a) and 9-301(d) (2002).[2]  Section 9-303(a) ("Retaliation for testimony") states:

> (a) Prohibited – A person may not intentionally harm another or damage or
> destroy property with the intent of retaliating against a victim or witness for:
> (1) giving testimony in an official proceeding; or
> (2) reporting a crime or deliberate act.

Md. Code Ann., Crim. Law § 9-303(a).  Section 9-301(d) ("Definitions") provides the definition

of "witness" used in § 9-303(a):

> (d) Witness – Witness means a person who:
> (1) has knowledge of the existence of facts relating to a crime or delinquent act;
> (2) makes a declaration under oath that is received in evidence for any purpose;
> (3) has reported a crime or delinquent act to a law enforcement officer,
> prosecutor, intake officer, correctional officer, or judicial officer; or
> (4) has been served with a subpoena under the authority of a court of this State,
> any other state, or the United States.

Miller alleges that he was the victim of a wrongful discharge by USF.  According to

Miller, he was terminated for "report[ing] a suspected crime to the appropriate law enforcement

or judicial officer," *i.e.,* he discussed the accounting irregularities at USF and Royal Ahold with

AUSA Jonas, the SEC, and the FBI.  Miller asserts that he is a "witness" pursuant to both § 9-

301(d)(1) and (3) – he "has knowledge of the existence of facts relating to a crime or delinquent

act" and "has reported a crime or delinquent act to a law enforcement officer, prosecutor, intake

officer, correctional officer, or judicial officer." According to Miller, he "is thus a 'witness'

under Maryland law both because he has knowledge of the accounting irregularities of USF and

Royal Ahold (*i.e.,* knowledge of the facts of an alleged crime) as well as because he reported

those irregularities (*i.e.,* a crime or delinquent act) to the SEC and the FBI (*i.e.,* law enforcement

officers) and AUSA Jonas (*i.e.,* a prosecutor)."  Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss

---

[2] The statutes relied upon in *Wholey* were previously codified at Md. Ann. Code, Art. 27
§ 762(a) (1957, 1996 Repl. Vol., Supp. 2001) (repealed and reenacted in 2002).

Count VII of the Am. Compl. 5.  Accordingly, Miller claims that he is subject to the protection of § 9-303(a)(2), and his termination from USF constitutes unlawful discharge in violation of the holding in *Wholey.*

USF, by contrast, asserts that the conduct that Miller alleges led to his discharge falls outside the protection offered by *Wholey.*  While USF concedes that Maryland "protects employees from termination for reporting suspected criminal activities to the appropriate law enforcement authorities,*"  Porterfield v. Mascari*, 823 A.2d 590, 603 (Md. 2003), citing *Wholey*, USF asserts that the Maryland courts do not protect employees responding to an investigation *already underway*.  Def.'s Mot. to Dismiss Count VII of the Am. Compl. 6.  Because Miller did not initiate the government's criminal investigation into USF and Royal Ahold – he merely responded to inquiries from the government in response to an investigation that was already underway – Miller is not a "whistle blower," and therefore is not eligible for the protection extended by *Wholey.*  USF, in short, would limit *Wholey* to those situations where an employee who reports a suspected crime initiates the investigation.  In support of this argument, USF argues that § 9-303 should be read *in pari materia* with § 9-501, the statute prohibiting false statements to law enforcement officers.  Section 9-501 only prohibits the making of false statements that instigate police investigations.  *See Jones v. State,* 765 A.2d 127, 129 (Md. 2001).  According to USF, that same limitation must apply to the witness reports protected by § 9-303(a)(2).

Because *Wholey* is a relatively recent case, there is no Maryland case law interpreting what it means to "*report[] a suspected crime* to the appropriate law enforcement or judicial officer," 803 A.2d at 495.  This is the primary issue in dispute between the parties.  I find that

6

Miller has the stronger argument, based on legal precedent, public policy, and common sense.

First, there is no support for the assertion that one who "responds" to questions posed by the authorities investigating a crime is not "reporting" a crime. The primary meaning of the verb report, as defined by *The American Heritage Dictionary, New Collegiate Edition,* is "To make or present an account of (something), often officially, formally or regularly; to relate or tell about; to present; to report one's findings." This definition would encompass Miller's conversation with AUSA Jonas, the SEC, and the FBI, wherein he "fully and truthfully disclosed his knowledge of the accounting irregularities at USF and Royal Ahold." Am. Compl. ¶ 69. In other words, to "report" suspected crime means to tell law enforcement what one knows about the crime alleged. USF does not present any explanation for why the court should interpret the word "report" more restrictively than its common meaning.

Second, there is little support for USF's contention that § 9-303 should be read *in pari materia* with § 9-501. *In pari materia* counsels that statutes on the same subject matter should be construed together. *See Black's Law Dictionary* (4th ed. 1968). Section 9-303, however, concerns obstruction of justice, whereas § 9-501 concerns false statements to law enforcement officers. The subject matter of the two statutes is related but not identical. Moreover, § 9-501 only concerns reports that initiate investigations because the language of the statute is limited to false statements made "with intent to deceive and to *cause an investigation or other action to be taken* as a result of the statement, report, or complaint." Md. Code Ann., Crim. Law § 9-501. As the Maryland Court of Appeals made clear in *Jones,* the limitation in the false statement statute exists because the legislature put it there. *See Jones,* 765 A.2d at 129-31. The express terms of § 9-303, by contrast, do not include a causative or temporal limitation. Instead, § 9-303 by its

7

plain terms applies to any person who reports a crime.  Finally, USF attempts to limit the scope
of § 9-303 through a reference to § 9-501 in *Wholey*.  After holding that "we... adopt a civil
cause of action in wrongful discharge for employees who are discharged for reporting suspected
criminal activity to the appropriate authorities," *Wholey,* 803 A.2d at 494, the court invoked the
predecessor of § 9-501 in a footnote: "Of course, the protection afforded to those who report
criminal activity would be eliminated should such report prove to be false...." *Id.,* n.13. USF
would have this court equate a "report" of a crime pursuant to § 9-303 with a "report" made
"with intent to cause an investigation or other action to be taken as a result thereof" pursuant to §
9-501.  A better interpretation of this language, however, is that the court recognized that a false
statement to a law enforcement officer – the subject of § 9-501 – can be a subset of the larger
category of "reports" that would be filed with "the appropriate law enforcement or judicial
officer*"* pursuant to the holding in *Wholey*.  Indeed, whereas § 9-501 only applies to "law
enforcement officer[s]," *Wholey's* holding clearly applies to reports made to *"*the appropriate
law enforcement or *judicial officer.*" *Id.*  As such, *Wholey* recognizes that § 9-303 is broader in
scope than § 9-501.

Third, as a matter of public policy, Miller has a stronger argument.  The Maryland Court
of Appeals has found that "[t]he foundation of the tort of retaliatory discharge lies in the
protection of public policy, and there is a clear public policy favoring investigation and
prosecution of criminal offenses."  *Adler,* 432 A.2d at 469 (internal citations omitted).  USF does
not have a compelling argument for its assertion that only those witnesses who first report a
suspected crime, or those who are the initiators of their conversations with law enforcement
officials, are subject to protection under *Wholey*.  USF asserts that individuals such as Miller,

8

who merely respond to inquiries from law enforcement, are not worthy of the same protection as

a "whistle blower" because the former does not reveal evidence of a previously unknown crime.

But this criticism is misguided.  The government has a substantial interest in receiving the

cooperation and testimony of *any* employee who has knowledge of criminal activity, regardless

of the status of the government's investigation.  Subjecting an employee to possible termination

for his cooperation with an ongoing investigation could serve as a significant barrier to the

government's acquisition of relevant information, because the employee will be less likely to

cooperate if he knows that it could result in his termination.[3]  Thus, it is in the public interest to

interpret *Wholey* to apply to any person who reports a crime.

Based on the foregoing, I believe that Miller has adequately stated a claim for wrongful

discharge.  Accordingly, I will deny USF's motion to dismiss the wrongful discharge claim in

Miller's amended complaint.

II      Motion for Partial Summary Judgment

A.      Background

Miller has sued his former employer for failure to provide post-termination benefits

under the terms of the October 4, 2000 Employment Agreement (the "Employment Agreement")

---

[3] USF asserts that if Miller's interpretation of *Wholey* is endorsed by the court, then employees who have committed a crime could protect themselves from termination by disclosing the crime, upon questioning from the authorities.  *See* Reply Mem. in Supp. of Def.'s Mot. to Dismiss Count VII of the Am. Compl. 4.  This argument confuses the issues.  Under the doctrine of wrongful discharge, the employer would not be able to terminate the employee for reporting the crime to the authorities.  The employer would, however, still be able to terminate the employee for the underlying crime.  Moreover, USF does not explain how the "whistle blower" exception would not culminate in the same result.  Under USF's interpretation of *Wholey,* an employee who has committed a crime could report his own illegal act to the authorities in order to use the wrongful discharge tort as a shield against termination.

and other agreements between Miller and the defendants.

Prior to Royal Ahold's acquisition of USF in 2000, Miller's employment with USF was governed by a series of agreements, including a Change in Control Agreement dated January 4, 1996 (the "CIC Agreement").  After Royal Ahold acquired USF, USF and Miller entered into the Employment Agreement, several provisions of which are dispositive to Miller's motion.

First, Miller and USF agreed to terminate the CIC Agreement:

> Termination of Employment Agreements
> You and USF are party to the following Employment Agreements (collectively, the "Employment Agreements"):... (2) an Employment Agreement dated January 4, 1996 (the "Change in Control Agreement")....
>
> Except as otherwise provided in this letter, the Employment Agreements ... are hereby terminated, and shall be of no further force and effect.

Second, Miller and USF agreed to continue some of the terms of the CIC Agreement and to incorporate them into the Employment Agreement:

> Preservation of Certain Rights
>
> Notwithstanding anything to the contrary set forth herein, regardless of the basis of termination, whether with or without cause and whether such termination is initiated by you or USF, upon termination of your employment with USF, you shall be entitled to ....  In addition, both during your continued employment with USF and after termination of your employment, ... the provisions regarding USF's payment of your costs set forth in the last sentence of Section 8 of the Change in Control Agreement, copies of which are appended hereto as ... Appendix 5 ... shall continue in full force and effect.  USF acknowledges that your rights as provided in this paragraph may not be modified or terminated without your express written consent.

Among the terms of the CIC Agreement that were incorporated into the Employment Agreement was USF's obligation, in the event of any litigation over the Employment Agreement, to pay Miller's reasonable legal fees and expenses:

> The Company agrees to pay as incurred, to the full extent permitted by law, all

legal fees and expenses which the Executive may reasonably incur as a result of
any contest regardless of the outcome thereof by the Company, the Executive, or
others of the validity or enforceability of, or liability under, any provisions of this
Agreement, or any guarantee of performance thereof (including as a result of any
contest by the Executive about the amount of payment pursuant to this
Agreement), plus in each case interest on any delayed payment at the applicable
Federal rate provided for in Section 7872(f)(2)(A) of the Internal Revenue Code
of 1986, as amended (the "Code").

Miller alleges that USF is obligated to pay his reasonable legal fees and expenses as they

are incurred because this case involves USF's failure to provide certain post-termination benefits

pursuant to the Employment Agreement.  On March 30, 2005, counsel for Miller wrote to

counsel for USF demanding that USF reimburse Miller for his counsel fees and expenses

incurred to date and commit to paying all reasonable future counsel fees and expenses Miller

may incur in this case.  By letter dated April 4, 2005, USF's counsel, on behalf of USF, rejected

Miller's demand.

B.      Standard of Review

Miller has moved for partial summary judgment ordering USF to reimburse him for his

reasonable legal fees and expenses incurred in this case, including prejudgment interest on

payments due on or before the date of the court's order.  Rule 56(c) of the Federal Rules of Civil

Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show that there is no genuine issue
as to any material fact and that the moving party is entitled to a judgment as a matter of
law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the

motion:

By its very terms, this standard provides that the mere existence of *some* alleged
factual dispute between the parties will not defeat an otherwise properly

> supported motion for summary judgment; the requirement is that there be no
> *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

C.      Analysis

1.      Choice of Law

The first issue in dispute is which state's law – Maryland or Delaware – controls the interpretation and application of the Employment Agreement.  USF asserts that Delaware law should govern Miller's indemnity claim because USF is incorporated in Delaware and, therefore, Delaware law controls questions in this case that concern the company's internal affairs.  Miller, by contrast, asserts that Maryland law should control the outcome of the case because the dispute concerns a matter of contract law, and the contract was formed in Maryland.  For the reasons discussed below, USF has the better argument.

As a threshold matter, the court acknowledges it has previously held that "because Miller's Employment Agreements were executed in Maryland and related to his employment in Maryland, Maryland law will apply to the companies' contract claims." *Miller v. U.S. Foodservice, Inc*., 361 F.Supp.2d 470, 474 (D.Md. 2005). Here, however, the Employment Agreement states that USF will "pay as incurred, *to the full extent permitted by law*, all legal fees and expenses which the Executive may reasonably incur...." (emphasis added)  This, of course, leaves open the question of which state's law controls interpretation of the indemnification provision.

As noted in the earlier opinion, "the law of a corporation's state of incorporation applies to claims arising from the company's internal affairs." *Miller,* 361 F.Supp.2d at 474. Indemnification, as an internal corporate affair, is governed by the law of the state of incorporation.  *See* James J. Hanks, Jr., *Maryland Corporation Law* 200 (2004 Supp.), *citing Safeway Stores, Inc. v. National Union Fire Ins. Co*., 64 F.3d 1282, 1289 n.20 (9th Cir. 1995); *see also A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 1007 (4th Cir. 1986) (finding that "defendants were entitled to indemnification by the debtor under the corporate by-laws and the statutes of Virginia, the State of debtor's incorporation....").  USF is a Delaware corporation. Accordingly, Delaware law, not Maryland law, should control the extent of the indemnification provisions in the Employment Agreement.  *Cf. Choate, Hall & Stewart v. SCA Services, Inc.,* 392 N.E.2d 1045, 1049 (Mass. 1979) (distinguishing between contract disputes, which are subject to the laws of the place of contract, and disputes relating to the internal affairs of the corporation, which are subject to the laws of the place of incorporation).

    2.     Public Policy

USF asserts that the indemnification provision is contrary to the clear public policy of Delaware and is, therefore, unenforceable.[4]  Miller, by contrast, asserts that the indemnification provision is fully consistent with Maryland law.  Because I have decided that Delaware law should guide the interpretation and application of the Employment Agreement, I do not initially address Miller's arguments, which are solely based on Maryland law.  This leaves open the question of whether the indemnification provision violates Delaware public policy.  It does not.

Miller argues that the Employment Agreement requires USF to indemnify him for his legal expenses in his suit against the company for reinstatement of his employment benefits. USF responds that this claim is barred by § 145 of the Delaware General Corporation Law ("DGCL"), which permits a corporation to indemnify the expenses incurred by a director or officer, employee or agent in a suit to which that person is made a party by reason of that status, so long as that person acted in "good faith and a manner reasonably believed to be in or not opposed to the best interests of the corporation."[5]

---

[4] Both USF and Miller characterize the last sentence of section 8 of the CIC Agreement as an indemnification provision.  *See* Mem. in Opp. to Plf.'s Mot. for Partial Summ. J. 7-12; *see also* Plf.'s Reply Mem. in Supp. of Mot. for Partial Summ. J. 5-8.  The only issue is in dispute is whether Delaware or Maryland statutes governing indemnification control the interpretation and application of the provision.

[5] DGCL § 145(a) provides in pertinent part, "A corporation shall have power to indemnify any person ... by reason of the fact that he is or was a director, officer, employee or agent of the corporation ... against expenses ... actually and reasonably incurred by him ... *if he acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the corporation*." DGCL § 145(a) (emphasis added).  Similarly, under § 145(b), a corporation shall have power to indemnify any person who is a party to any action or suit "by or in right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation ... *if the person acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the corporation*...." DGCL § 145(b) (emphasis added).  Under subsection (a) or (b), any indemnification not ordered by a court "shall be made by that corporation only as authorized in

A corporation may advance expenses (including attorneys' fees) incurred by an officer or director in defending a civil suit in advance of the final disposition of such action.  This may occur only "upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section."  DGCL § 145(e).

USF asserts that Miller has not satisfied the "good faith" requirements in § 145 because he breached his fiduciary duties, so his claim for indemnification must fail.  In order to escape the "good faith" clauses of §§145(a) and (b), Miller asserts that these provisions do not constitute the exclusive grant of indemnification power, because § 145(f) expressly allows corporations to indemnify officers in a manner broader than that set out in the other subsections.  The "non-exclusivity" language of § 145(f) provides:

> The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section *shall not be deemed exclusive of any other rights* to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding office.

> DGCL § 145(f) (emphasis added).

USF cites the Second Circuit's opinion in *Waltuch v. Conticommodity Svs., Inc.,* 88 F.3d 87 (2d. Cir. 1996), for the proposition that Delaware public policy precludes a Delaware corporation from indemnifying a corporate officer who has not acted in good faith.  To be more precise, *Waltuch* holds that the non-exclusive language in § 145(f) is constrained by the other

_____

the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section."  DGCL § 145(d).

requirements imposed by § 145, including the "good faith" requirement in subsections (a) and (b).  In dicta, the court in *Mayer v. Executive Telecard, LTD.,* 705 A.2d 220, 225 n.6 (Del. Ch. 1997) "agree[d] with the Second Circuit's construction of § 145 that a Delaware corporation lacks the power to indemnify a party who did not act in good faith."[6]

On at least one occasion, however, the Delaware Court of Chancery has found that corporations must honor voluntarily assumed agreements to advance legal fees, even where the subject matter of the litigation involves allegations of bad faith against the officers.  *See Fasciana v. EDS Corp.,* 829 A.2d 160, 167, 173-74 (Del. Ch. 2003).[7]

---

[6] Miller cites *Hibbert v. Hollywood Park, Inc.,* 457 A.2d 339, 343 (Del. 1983), which holds that "[t]he corporation can also grant indemnification rights beyond those provided by the statute," despite allegations of bad faith on the part of directors.  However, after making this assertion, *Hibbert* cites Arsht, *Indemnification Under Section 145 of the Delaware General Corporation Law,* 3 Del.J.Corp.L. 176-77 (1978), which states, in pertinent part:

> The question most frequently asked by practicing lawyers is what subsection (f), the non-exclusive clause, means....  The question which subsection (f) invariably raises is whether a corporation can adopt a by-law or make a contract with its directors providing that they will be indemnified for whatever they may have to pay if they are sued and lose or settle.  The answer to this question is "no."  Subsection (f) permits additional rights to be created, but it is not a blanket authorization to indemnify directors against all expenses, fines, or settlements of whatever nature and regardless of the directors' conduct.  The statutory language is circumscribed by limits of public policy....

Thus, *Hibbert* would seem to support USF's position that indemnification rights permitted under § 145(f) must be consistent with the other substantive provisions of § 145.

[7] Miller also cites *Perconti v. Thornton Oil Corp.,* 2002 WL 982419 (Del. Ch. 2002), and *Kapoor v. Fujisawa Pharm. Co., LTD.,* 1994 WL 233947 (Del. 1994) (unpublished opinion) for the same proposition.  However, both *Perconti* and *Fujisawa* do not support Miller's argument because they concern the application of § 145(c).  Pursuant to § 145(c), if a former officer is "successful on the merits or otherwise" in a proceeding described in § 145(a), then he is entitled to indemnification regardless of whether or not he acted in good faith or in what he perceived to be in the best interests of the corporation.  *Perconti,* 2002 WL 982419, *3.  Thus, the good faith inquiry required by § 145(a) is not mandated under § 145(c), *see id.* at *4, n.22.  Hence, in both

Nothing in the statute or these decisions would eliminate USF's obligation "to pay as incurred" Miller's legal fees and expenses.  As DGCL § 145(e) makes clear, a corporation may advance legal fees and expenses to an officer if the officer promises to repay the legal fees and expenses if the court ultimately does not find that he met the good faith requirement.  Hence, while USF may later be entitled to a refund from Miller, nothing in the Delaware statute absolves USF from fulfilling its contractual obligation to pay Miller's reasonable legal fees and expenses as incurred.  Accordingly, I find that the Employment Agreement does not violate Delaware public policy.[8]  I express no opinion whether Miller, at the end of the day, will be able

_____

*Perconti* and *Fujisawa,* the courts did not address the issue of good faith.

[8]Assuming for the sake of argument that Maryland law applies, the court reaches the same conclusion.  The Maryland Code, Corporations and Associations, permits a corporation to indemnify a director *unless* it is "established" that the individual: (1) acted "in bad faith" or with "active and deliberate dishonesty;" (2) "actually received improper benefit in money, property or services;" or (3) "[i]n the case of any criminal proceeding, had reasonable cause to believe that [his] act or omission was unlawful."  *See* Md. Code, Corp. & Assoc. § 2-418(b)(1).  Thus, the requirement in § 2-418(e)(1) for a determination that the director "has met the standard of conduct set forth in subsection (b)" is initially satisfied simply by a determination that it has not yet been "proved" that the director's conduct fell within any of the three exceptions.  *See* James J. Hanks, Jr. & Larry P. Scriggins, *Let Stockholders Decide: The Origins of the Maryland Director and Officer Liability Statute of 1988,* 18 U. Balt. L. Rev, 235, 249 (1989).  In this case, Royal Ahold and USF have countersued, claiming that Miller violated the fiduciary duties of due care, good faith, and loyalty and, as a result, USF should not be required to reimburse Miller's legal fees.  However, because these claims have not yet been "established" – they are merely allegations – the statute does not foreclose USF's obligation to reimburse Miller for his legal fees.

The statute also provides for advance indemnification of a director's legal fees.  Md. Code, Corp & Assoc. § 2-418(f) allows a corporation to advance legal fees to a director, so long as the director provides an affirmation of good faith and agrees to repay the funds if his good faith is ultimately disproved.  Section 2-418(g), however, permits a corporation to expand the indemnification rights of directors beyond the default rules by "agreement or otherwise...."  Unfortunately, there is no case law imposing any limitations on the scope of § 2-418(g).  But at least one commentator has argued that "'other rights' would be limited by public policy considerations," and "[p]ublic policy would ... probably be interpreted at least as broadly as the indemnification now permitted by section 2-418(b)...."  Hanks & Scriggins at 251.

to establish a valid claim for indemnification under Delaware law.

        3.     Contract Ambiguity

      USF argues that under the clear and unambiguous terms of the Employment Agreement,

USF has no obligation to reimburse Miller's legal fees and expenses in this case.  USF concedes

that the Employment Agreement expressly preserved the last sentence of section 8 of the CIC

Agreement.  However, USF asserts that "this Agreement" references the CIC Agreement, to the

extent that it was not terminated by the Employment Agreement.  Thus, under USF's

interpretation of the contract, USF is only obligated to pay Miller's legal fees in a contest over

the validity or enforceability of a provision of the CIC Agreement preserved by the Employment

Agreement.  Miller, by contrast, asserts that the words "this Agreement" refer to the

Employment Agreement.  Rather than copy the preserved provisions of the CIC Agreement,

those provisions were simply incorporated by reference into the Employment Agreement.  While

the words "this Agreement" did not change, their reference, of necessity, had to.  According to

Miller, USF's interpretation of the contract would be nonsensical, because the parties had plainly

agreed to cancel the CIC Agreement by the express terms of the Employment Agreement.

      As a corollary, USF asserts that provisions of the CIC Agreement – including Miller's

right to legal fees under section 8 – lapsed on the third anniversary after the "Effective Date" of

the agreement, or a change in control.  A change in control occurred on April 20, 2000 when

---

Because USF has not yet proved that Miller violated § 2-418(b), USF cannot argue that public
policy considerations should limit indemnification pursuant to § 2-418(g).

      Section 2-418(j)(2) of the Md. Code, Corp. & Assoc., provides that a corporation may
indemnify and advance expenses to an officer, employee, or agent of the corporation to the same
extent that it can indemnify directors pursuant to this section.  In the case of officers, the
corporation's ability to indemnify is even broader.  According to § 2-418(j)(3), a corporation can
agree to provide advance legal fees as they see fit to officers by "contract."

Royal Ahold acquired USF.  Miller resigned from USF on May 13, 2003, more than one month

after the third anniversary of the change in control.  As such, USF asserts that the Employment

Agreement does not obligate USF to pay Miller's legal fees and expenses.  Miller disputes this

assertion, arguing that the "Effective Date" provisions were not preserved as addenda to or

incorporated in the Employment Agreement, so the expiration provision of the CIC Agreement

was not carried over to the Employment Agreement.

Under Maryland law, "a contract is not ambiguous merely because the parties disagree as

to its interpretation."  *Lerner Corp. v. Three Winthrop Properties, Inc.,* 723 A.2d 560, 563 (Md.

Ct. Spec. App. 1999).  Instead, under Maryland law, a contract is ambiguous only if it is subject

to more than one interpretation when read by a reasonably prudent person.  *See Sy-Lene of*

*Washington, Inc. v. Starwood Urban Retail II, LLC,* 829 A.2d 540, 547 (Md. 2003).

In this case, I find that the contract is unambiguous.  As Miller argues, it seems unlikely

that the parties would preserve the indemnification language from the CIC Agreement merely to

pay Miller's legal fees in a contest over the validity or enforceability of one of the few preserved

sections of the CIC Agreement.  Indeed, USF does not offer any explanation for why the parties

would have intended the words "this Agreement" in an addendum to the Employment

Agreement to refer to another agreement they had terminated.  Likewise, I believe that all of the

provisions in the CIC Agreement not incorporated as addenda to the Employment Agreement –

including the "effective date" provision – were expressly nullified by the plain terms of the

Employment Agreement. Accordingly, there is no merit in USF's argument that the expiration

provision of the CIC Agreement somehow transferred over to the Employment Agreement.

4.      Recoupment and Setoff

Pursuant to Federal Rule of Civil Procedure 13, USF has asserted counterclaims against Miller for breach of his fiduciary duties of care, good faith, and loyalty, and for breach of the Employment Agreement.  Miller's motion to dismiss these counterclaims has been denied.  *See Miller,* 361 F.Supp.2d at 480-81, 483-84.  USF seeks substantial damages for Miller's breaches, including losses that USF suffered from Miller's misconduct and Miller's salary and incentive-based bonuses from 2000 to 2002.

USF asserts that no provision of the Employment Agreement waives USF's rights of recoupment and setoff.  Recoupment permits a defendant to reduce or completely counterbalance a plaintiff's monetary claim because of a claim the defendant has against the plaintiff arising from the same transaction.  *See First Nat'l Bank of Louisville v. Master Auto Serv. Corp.,* 693 F.2d 308, 310 n.1 (4th Cir. 1982).   Setoff permits the same reduction or counterbalancing because of a claim the defendant has against the plaintiff arising from an independent transaction.  *See id.*  USF argues that "it may withhold any legal fees and expenses it owes Miller (if any) in recoupment or setoff against its counterclaims until both parties' rights and obligations are finally adjudicated," making Miller's motion for summary judgment "premature."  Mem. in Opp. to Pl.'s Mot. for Partial Summ. J. 17.

Miller opposes recoupment and setoff, arguing that USF contractually gave up these rights when it agreed to pay Miller's legal fees "as incurred" and "regardless of the outcome." According to Miller, "[t]he words 'as incurred' eliminate any obligation by Miller to wait until the end of the litigation for reimbursement; the words 'regardless of the outcome' divorces this transactional cost from the merits of the case...." Pl.'s Rep. Mem. in Supp. of Mot. for Partial Summ. J. 11.

There is no relevant Maryland case law concerning whether recoupment and setoff can delay USF's payment of Miller's legal fees and expenses pending the outcome of this litigation. The Delaware courts have addressed similar disputes, however, although in unpublished opinions.  First, in *Lipson v. Supercuts, Inc.,* 1996 WL 560191, *2 (Del.Ch. 1996), the Delaware Court of Chancery held that a corporation's arguments concerning an officer's ultimate entitlement to indemnification, and the reasonableness of the amount thereof, are not necessary to consideration of a partial summary judgment motion for the advancement of attorney's fees. Second, in *Kaung v. Cole Nat'l Corp.*, 2005 WL 1635200, *7 (Del. 2005), the Supreme Court of Delaware held that a proceeding to advance legal fees to a corporate officer is a "summary proceeding," and as such, it is "not appropriate for litigating indemnification and recoupment." Indeed, "[t]he detailed analysis required of such claims is both premature and inconsistent with the purpose of a summary proceeding."  *Id.*

Consistent with the approach advanced by the Delaware courts, this court will not allow USF's recoupment and setoff claims to delay the payment of attorney's fees to Miller.  As the *Lipson* court aptly noted, "a proceeding of this kind must be summary in character, because if advance indemnification is to have any utility or meaning, a claimant's entitlement to it must be decided relatively promptly." 1996 WL 560191 at *2.  If a corporation can circumvent its obligation to pay an officer's legal fees simply by filing a counterclaim against the officer, then advance indemnification provisions will be rendered virtually null whenever a corporation wishes to avoid that obligation.  As with the possible reimbursement of fees, recoupment and setoff can be addressed at the conclusion of the case.

5.    Reasonableness of Legal Fees and Expenses

USF asserts that Miller's legal fees and expenses are unreasonable.  USF cites decisions from courts in other jurisdictions to assert that "'reasonably' incurred fees and expenses must be limited both quantitatively and *qualitatively*."  Def.'s Mem. in Opp. to Pl.'s Mot. for Partial Summ. J. 18.  This means, according to USF, that "the reference to fees 'reasonably incur[red]' requires that the time spent on the claims be reasonable and that the claimant's litigation position be reasonable."  *Id., quoting Curby v. Solutia, Inc.,* 351 F.3d 868, 873 (8th Cir. 2003).  USF asserts that it suffered "substantial damages" from "Miller's breaches of fiduciary and contract duties," which, in turn, "suggest[s] that his claims against USF are unreasonable."  *Id.*  Again, this is a version of the argument for reimbursement, or for recoupment or setoff, which should be addressed at the end of the case.

Miller responds that "the reasonableness of the legal fees Miller has and will incur is irrelevant to USF's contractual obligation to pay all such reasonable fees."  Pl.'s Reply Mem. in Supp. of Mot. for Partial Summ J. 12.  According to Miller, "[i]f, after the Court orders USF to meet its obligation, USF believes that any of Miller's submitted bills are unreasonable, it may contest them on the merits at that time."  *Id.*  To make this assessment, however, Miller must be required to file documentation concerning the amount of hours worked and how the time was spent.

Based on the foregoing, I find that Miller is entitled to advance payment of his reasonable legal fees and expenses, as incurred, pursuant to the Employment Agreement.  However, no prejudgment interest will be considered until the ultimate determination of whether Miller is entitled to be indemnified.  Accordingly, I grant Miller's motion for partial summary judgment.

A separate order follows.

22

December 19, 2005                         /s/_____
Date                                     Catherine C. Blake
                                         United States District Judge